O

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **PATIENT CARE SYSTEMS, INC., et al.,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-01-3120 |
| | § | |
| **SIZEWISE RENTALS, INC.,** | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pending before the Court are Defendant SizeWise Rentals, Inc.'s ("SizeWise") Show Cause Motion for Civil Contempt Against PCS and Non-Parties (Dkt. #94) and Plaintiff s' Motion for Show Cause Order for Civil Contempt (Dkt. #110).[1] Also pending before the Court is SizeWise's Contingent Motion for Leave to Amend (*See* Dkt. #142) and the Motion to Quash/Dismiss Order to Appear and Show Cause (Dkt. #119) of Non-Party Respondents CareSource, LLC ("CSLLC") and CareSource-Tulsa, LLC ("CST") (collectively and/or more generally "CareSource"). A hearing on the parties' cross-motions for contempt was held on October 12 and 13, 2004. The Court makes the following findings and conclusions. To the extent that any conclusion of law is more properly characterized as a finding of fact, and vice versa, the Court adopts it as such.

**Introduction**

SizeWise is a Kansas corporation that manufactures and distributes bariatric products through such methods as leasing, renting, and consignment. The PCS entities are engaged in the rental of specialty patient care equipment, such as bariatric products, to medical facilities. Patient

---

[1] Plaintiffs are Patient Care Systems, Inc., Superior Medical Systems, Inc., Patient Care, Inc., Patient Care Systems of Oklahoma, Patient Care Systems (North Carolina), Inc., and Patient Care Systems of South Dakota. Unless specified otherwise, throughout these findings, all Patient Care entities may at times be referred to collectively as "PCS."

Care Systems, Inc. is a Texas corporation, Superior Medical Systems, Inc. is a Florida corporation, Patient Care, Inc. is a North Carolina corporation, Patient Care Systems of Oklahoma is an Oklahoma corporation, Patient Care Systems (North Carolina), Inc. is a North Carolina corporation, and Patient Care Systems of South Dakota is a South Dakota corporation. All of the PCS entities are affiliated through common shareholder ownership and all of those entities who are not incorporated in Texas have management teams located in Houston, Texas. CSLLC and CST are Oklahoma corporations. CareSource Retail is another CareSource entity that was referred to at the hearing.

This Court has subject matter jurisdiction over the dispute. With the exception of CSLLC CST, and CareSource Retail, the Court also has personal jurisdiction over the parties in this dispute.

A number of the PCS entities entered into agreements with SizeWise entitled "Consignment for Rental/Service Agent Agreement" (the "Agreements"). Pursuant to these Agreements, those entities leased bariatric equipment supplied by SizeWise to medical facilities in specific geographic areas in exchange for a portion of the rental revenues.

PCS filed a declaratory judgment action in September 2001, seeking a declaration from the Court regarding certain non-competition covenants found in the Agreements. On March 12, 2003, the parties informed the Court that they had settled the declaratory judgment action. On March 17, 2003, the Court signed an Agreed Permanent Injunction (Dkt. #92) ("Injunction") that was largely the basis for the settlement. Subsequently, the parties filed cross-motions to hold each other in contempt for violating the Injunction.

The Injunction was issued against Plaintiffs Patient Care Systems, Inc., Superior Medical Systems, Inc., Patient Care, Inc., Patient Care Systems of Oklahoma, Patient Care Systems (North Carolina), Inc., Patient Care Systems of South Dakota "and each of them, and each of their agents, servants, employees, and attorneys, and those persons in active concert or participation with them

2

who receive actual notice . . . ."

In pertinent part, the Injunction enjoined them from the following:

> calling upon, selling, soliciting, diverting or taking away or accepting leasing, rental or other business for Bariatric Equipment (as hereafter defined) from any entity listed on Exhibit "A" attached hereto, and further from directly or indirectly requesting or advising any entity listed on Exhibit "A" to withdraw, curtail, alter or cancel their business with SizeWise.

Despite this language, the Injunction also contained an express limitation on its scope. It specifically states that "[t]his injunction applies only to those specific entities at the specific locations listed on Exhibit 'A.'"

"Bariatric Equipment" is defined in the Injunction to "mean and refer to beds, wheelchairs, commodes, lifts and other medical equipment designed for use in hospitals, nursing homes and other medical service providers by patients weighing 350 pounds or more."

The Injunction also mandated that, within ten business days after July 10, 2004, SizeWise was ordered to notify PCS of "any entity on Exhibit 'A' to whom SizeWise has not leased, rented or sold Bariatric Equipment from the date of this injunction up to and including July 10, 2004 . . . ." After this notification, any reported entities would be excluded from Exhibit "A".

On March 9, 2004, SizeWise filed a Show Cause Motion for Civil Contempt against all the PCS entities named in the Injunction, as well as non-parties Barry W. Bearden ("Bearden"), Safe-T Care Manufacturing Co., Inc. ("Safe-T Care"), CSLLC and CST. Thereafter, on August 6, 2004, PCS filed its Motion to Show Cause Order for Civil Contempt against SizeWise for its failure to give notice within ten days after July 10, 2004.

**Findings of Fact**

I.  **SizeWise's Motion for Contempt**

   A.  **SizeWise's Allegations**

In its motion for contempt, SizeWise makes four allegations. First, it alleges PCS violated

3

the Injunction when one of its salesman spoke to a Hermann Hospital employee. Second, it alleges that PCS violated the Injunction by soliciting bariatric business from Health South, a healthcare facility in Wichita Falls, Texas that is a prohibited facility listed on Exhibit "A" of the Injunction. The third allegation consists of two subparts. Subpart one is an allegation that PCS and Bearden have attempted to evade the Injunction by placing PCS equipment in prohibited hospitals (e.g., Kindred Northwest) through Bearden's affiliated company, Safe-T Care. The second subpart of the third allegation is that PCS is attempting to sidestep the Injunction through its relationship with SizeWise customers, a relationship forged by PCS as a distributor for SizeWise. In support of this part of the third allegation, SizeWise alleges Safe-T Care manipulated the bed specifications required by Harris County Hospital so that it could obtain the account. The fourth allegation is that PCS and CareSource are conspiring to side step the Injunction by placing PCS and Safe-T Care products into prohibited facilities through CareSource.

With respect to the first and second allegations, SizeWise introduced no evidence at the hearing to support its claims. SizeWise did attach affidavits concerning these allegations to its motion for contempt; however, the Court finds that evidence to be insufficient to support a contempt finding.
Moreover, there is no facility in Wichita Falls, Texas that is listed on Exhibit "A".

As to the first subpart of the third allegation, PCS admitted that it placed an Ambassador 1200 bed (i.e., the bariatric bed manufactured by Safe-T Care) into Kindred Northwest, a hospital listed on Exhibit "A". The bed was placed at the request of Kindred Northwest for a patient exceeding seven feet in height. As to the second subpart of the third allegation, Harris County Hospital District is not listed on Exhibit "A".

The four allegations above can be construed to contain the following two general claims: (1) the direct contempt by PCS of providing bariatric equipment to Exhibit "A" facilities, and (2) the

4

contempt orchestrated by Barry Bearden through Safe-T Care and its co-conspirator, CareSource.

**B.     Direct Contempt by PCS**

At the hearing, SizeWise produced no evidence of any direct violations by Patient Care, Inc., Patient Care Systems (North Carolina), Inc., or Patient Care Systems of South Dakota.

Superior Medical Systems, Inc. ("Superior") admits that it placed one bariatric bed in Sovereign Health facility in Clearwater, Florida. That facility was purchased by Sovereign Health from Mariner. Though Mariner is listed on Exhibit "A", Sovereign Health is not. There were no other allegations against Superior.

There was evidence introduced that Patient Care Systems, Inc. and Patient Care Systems of Oklahoma directly placed bariatric beds in Exhibit "A" facilities. These PCS entities admit that they have placed Ambassador 1200 beds and other bariatric equipment into facilities listed on Exhibit "A" fourteen times. Some PCS representatives understood the Injunction to permit the placement of such equipment so long as it was not for bariatric business. Thus, if a request was made for a bed for a patient weighing less than 350 pounds, PCS did not consider it to be "bariatric business." PCS admits that it had learned about a couple of mistakes where bariatric beds were placed in Exhibit "A" facilities for patients weighing more than 350 pounds, but PCS did not know that the patients weighed more than 350 pounds.

SizeWise asserts that PCS and its agents have actually admitted to no fewer than 30 direct violations of the Injunction and cites some deposition testimony in support thereof. Nonetheless, as the Court has determined that PCS is in contempt for its direct placement of bariatric equipment in Exhibit "A" facilities and as the parties have agreed that there should be a separate damages hearing in the event the Court finds liability, the Court does not deem it necessary to make a conclusive finding on the number of violations at this juncture.

### C. The Contempt Orchestrated by Barry Bearden Through Safe-T Care and its Co-Conspirator, CareSource

At all times pertinent to this case, PCS has been a corporation whose stock has been owned 100% by Bearden. Additionally, at all times pertinent hereto, Bearden has been the Chief Executive Officer ("CEO") of both PCS and Safe-T Care and in total control of the actions of both corporations.

Safe-T Care was in existence prior to the filing of the initial lawsuit and the Injunction. Safe-T Care was not a new, previously non-existent company formed to evade the Injunction. Prior to the filing of the initial lawsuit that led to the Injunction, Safe-T Care was not in the business of manufacturing the Ambassador 1200 bed. Safe-T Care had developed that bed, however, prior to the entry of said Injunction. The Ambassador 1200 is a bariatric bed.

Prior to the filing of the Injunction, SizeWise knew of Safe-T Care's existence and that it was owned and controlled by Barry Bearden. SizeWise attempted to include the term "Affiliates" as defined in the original PCS/SizeWise consignment agreement in a manner that would have included Safe-T Care within its ambit. However, SizeWise failed in that attempt.

Exhibit "A" includes the name CareSource located at 4350 Will Rodgers Parkway, Suite 102, Oklahoma City, OK 73108. That reference can only refer to CSLLC because it was the only CareSource entity that existed at the time of the Injunction on March 17, 2003. The Court finds that CST was not created until after the Injunction was signed.

Larry Pierce ("Pierce") is the owner and the CEO of both CSLLC and CST. In March or April, 2003 Pierce learned that the Court entered an Injunction and that PCS could no longer do bariatric business with CSLLC. Some time in July 2003, Bearden telephoned Larry Pierce and proposed that he and Pierce discuss the potential for this other company to accept the consignment of the Ambassador 1200 bed. Bearden knew that Pierce had a company, other than CSLLC, that was

in the distribution business.

Thereafter, On August 7, 2003, Pierce caused a previously existing limited liability company (a non-operating corporation unrelated to the dispute between PCS and SizeWise) to change its name to CareSource - Tulsa, LLC.[2] The idea for CST, however, was formed before the Injunction was entered in March 2003. Though its organizational documents were not completed until August 7, 2003, CST has been doing business since late June or early July 2003. CST could not have been a named party to the Injunction because it was not created until after the Injunction was signed. CST was not established for the purpose of aiding and abetting violations of the Injunction.

Approximately one week following August 7, 2003, Pierce traveled to Houston, Texas in the company of Clint Heath and Jesse Boisseau, both of whom were known to Pierce to be employees of PCS, to meet with Bearden.

The building housing Safe-T Care in Houston has no identification thereon except the name of PCS on the front doors and on the trucks in the parking lot. At least at the time of this meeting, Safe-T Care had no telephone number of its own. To reach Safe-T Care one would have to call PCS' phone number. As it was a hot day, the doors at the PCS warehouse were opened, and Pierce did not see the PCS name on the warehouse doors. After meeting with Bearden at the warehouse, Bearden, Pierce, Heath, and Boisseau took a fishing trip. Both Pierce and Bearden deny that the consignment of the Ambassador 1200 bed, or any other bariatric business, was discussed during the fishing trip.

Pierce knew there was a relationship between Bearden, Safe-T Care, and PCS. However, he did not know the nature or extent of that relationship. With respect to the Injunction, Pierce never

---

[2] PCS has stated that the creation date is July 24, 2003. However, for purposes of Oklahoma corporation law, CST's effective date, or the date it became officially recognized, is the date its certificate of conversion was filed in the secretary of state's office. *See* OKLA. STAT tit. 18, § 1007. In this case, that date was August 7, 2003.

saw the Injunction until he gave his deposition in the present dispute between the parties. Moreover, he did not even see Exhibit "A" to the Injunction until the day before he was scheduled to fly to Houston for the contempt hearing. As CSLLC's business was largely unaffected by bariatric business, the Injunction was of little or no significance to him. The Court finds Pierce's testimony that he did not know Safe-T Care was subject to the Injunction to be credible.

The agreement between Safe-T Care and CST is essentially that of a consignment agreement. Safe-T Care thus offers its customers a "consignment" with a right to purchase, an arrangement under which Safe-T Care is paid a fee when the distributor rents or otherwise generates revenue with the bed. CST is a consignee.

Safe-T Care and CST split all revenues made by CST 50/50. Under this arrangement, Safe-T Care has no control over to whom CST rents, the rates, or the duration of any rental.

The Court finds that though CST was not necessarily created for the purpose of violating the Injunction, it was used by Safe-T Care to rent and sell Ambassador 1200 beds.

At the hearing, Pierce admitted that CST has conducted bariatric business with at least nine hospitals listed on Exhibit "A". Thus, some of the revenue earned by Safe-T Care and CST resulted from sales to Exhibit "A" facilities.

**D.     Stryker Beds**

At the hearing, SizeWise argued that the Stryker beds owned by PCS were "bariatric equipment" as that term is defined in the Injunction. The Court finds all the relevant evidence to be to the contrary.

The history of the Stryker bed and its current marketing today, reflect that the bed was not designed for use by patients weighing 350 pounds or more and that no one markets it as bariatric equipment. Further, witnesses at the hearing corroborated this without dispute. The Court finds that

8

the Stryker beds do not come within the definition of "bariatric equipment" as defined in the Injunction.

### E. CareSource Retail

A third CareSource entity is named CareSource Retail. Larry Pierce also has an interest in this company but the ownership is different from that of CSLLC and CST. CareSource Retail, is a medical supply company, that is located inside a Wal-Mart store in Muskogee, Oklahoma. The organizational documents of CareSource Retail had not been completed at the time of the hearing on October 12 and 13, but it had been in operation since August 2004. It was thus created after the entry of the Injunction. Neither the company nor its location is listed on Exhibit "A". Moreover, it does not do any bariatric business.

## II. Patient Care Systems' Motion for Contempt

SizeWise admitted and acknowledged that it did not give the notice required by the Injunction within ten days after July 10, 2004. It intentionally decided not to comply with the Injunction. It, denies, however, that it is in contempt.

## Conclusions of Law

### I. Standard

Courts possess the inherent authority to enforce their own injunctive decrees. *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985), *cert. denied*, 474 U.S. 1056, 106 S. Ct. 794 (1986). An injunction binds not only the parties subject thereto, but also non-parties who act with the enjoined party. *Id.* Unlike parties to an injunction, who can be found in contempt even if they did not intend to violate an injunction, non-parties are differently situated. *See Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.,* 154 F.3d 1345, 1353 (Fed. Cir. 1998). "Non-parties are subject to contempt sanctions if they act with an enjoined party to bring about a result forbidden

9

by the injunction [(citations omitted)], but only if they are aware of the injunction and know that their acts violate the injunction." *Id.* (citing *Waffenschmidt*, 763 F.2d at 723-26, 726 ("Although good faith is irrelevant as a defense to a civil contempt order, good faith is relevant to whether [a non-party] aided or abetted [an enjoined party] in dissipating the funds with knowledge that it was violating the court's orders.").  "Nonparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order."  *Waffenschmidt*, 763 F.2d at 714.

The distinction between parties and non-parties is reflected in Rule 65(d) of the Federal Rules of Civil Procedure.  Rule 65(d) provides that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."  The Fifth Circuit has recognized that Rule 65(d)

> 'is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control.  In essence . . . defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.'

*Waffenschmidt*, 763 F.2d at 717 (quoting *Regal Knitwear Co. v. National Labor Relations Board*, 324 U.S. 9, 14, 65 S. Ct. 478, 481 (1945)).

Generally, there are only three ways that one can be subject to contempt for violating an injunction: (1) as a named party, (2) as one legally identified with a named party, or (3) as an aider and abetter.  *See Regal Knitwear*, 324 U.S. 9, 65 S. Ct. 478.  In other words, non-parties may be held in contempt if they "either abet the defendant, or [are] legally identified with him." *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930).  That common law principle is reflected in the text of Rule 65(d) of the Federal Rules of Civil Procedure.  As the Supreme Court has stated, the effect

10

of an injunction on non-parties "depends on an appraisal of [their] relations and behavior [with the enjoined party] and not upon mere construction of terms of the order." *Regal Knitwear*, 324 U.S. at 15, 65 S. Ct. 481.

Courts have consistently held that "successors" are within the scope of an injunction entered against a corporation and may be held in contempt for its violation. *See Additive Controls,* 154 F.3d at 1354; *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 179, 94 S. Ct. 414 (1973); *Regal Knitwear*, 324 U.S. at 14, 65 S. Ct. 478; *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d 914, 919-20 (7th Cir. 1996). As stated by the Federal Circuit, "[a]n injunction would be of little value if its proscriptions could be evaded by the expedient of forming another entity to carry on the enjoined activity." *Additive Controls*, 154 F.3d at 1354. The Supreme Court described successorship liability as turning on whether there is a "substantial continuity of identity" between the two organizations. *See Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 263-64, 94 S. Ct. 2236 (1974); *Golden State Bottling Co.*, 414 U.S. at 182, 94 S. Ct. 414; *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 551, 84 S. Ct. 909 (1964). The "substantial continuity of identity" test has been adopted as a general expression of the degree of closeness that Rule 65(d) requires for a non-party successor to be subject to an injunction. *See Additive Controls*, 154 F.3d at 1355 (citing *Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996)). To reiterate, courts again must appraise the successor's or assigns' "relations and behavior and not upon mere construction of terms of the order." *Regal Knitwear*, 324 U.S. at 15, 65 S. Ct. at 481.

In the Fifth Circuit, "[a] party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *SEC v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir. 1981). That is, the movant must establish three elements: (1) a court order was in effect,

(2) the order required certain conduct by the respondent, and (3) the respondent failed to comply with the court's order. *American Airlines, Inc. v. Allied Pilots Association,* 228 F.3d 574, 581 (5th Cir. 2000), *cert. denied*, 531 U.S. 1191 (2001). In a civil contempt proceeding, the movant bears the burden of establishing the elements of contempt by clear and convincing evidence. *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir. 1987). The clear and convincing evidence standard is higher than the "preponderance of the evidence" standard, common in civil cases, but not as high as "beyond a reasonable doubt." *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976). The Fifth Circuit has held that, in the contempt context, clear and convincing evidence is

> that weight of proof which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts' of the case.

*See Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citing In *re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) (quoting *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 285 n. 11, 110 S. Ct. 2841, 2855 n. 11 (1990))).

**II.     SizeWise's Motion for Contempt**

    **A.     Sufficiency of the Pleadings and Conclusion with Respect to the Stryker Beds**

It is apparent from both the pleadings and the record that SizeWise's motion for contempt contained ill-informed allegations. For instance, there was an allegation that a PCS entity solicited bariatric business from a prohibited facility in Wichita Falls, Texas, but no facilities in Wichita Falls were listed on Exhibit "A". Nonetheless, the improper claims do not render SizeWise's pleadings in support of its motion for contempt insufficient or defective. Rule 8 of the Federal Rules of Civil Procedure requires that a pleading set forth "a short and plain statement of the claim showing that

12

the pleader is entitled to relief." At the hearing, aside from its allegations regarding Stryker beds, SizeWise introduced no new claims or theories upon which it sought relief. It merely narrowed its allegations of contempt to two general categories: (1) the direct contempt by PCS of providing bariatric equipment to Exhibit "A" facilities, and (2) the contempt orchestrated by Barry Bearden through Safe-T Care and its alleged co-conspirator, CareSource. The Court finds that those two claims and the grounds upon which they rest were clearly manifested in the original pleading. The Court finds *Skinner v. White*, 505 F.2d 685 (5th Cir. 1974) relied upon by PCS to be distinguishable. With respect to the allegations regarding the Stryker beds, the Court determines that no relief can be obtained for the rental or sale of Stryker beds as those beds are not bariatric products. Therefore, no amendment to the complaint is necessary. SizeWise's Contingent Motion for Leave to Amend is denied as moot.

> **B.     Allegations Against PCS and Safe-T Care**
>
> **1.     Liability of PCS**

All PCS companies are subject to the Injunction as named parties.

SizeWise is not entitled to relief with respect to the first three specific violations it alleged in its motion for contempt. With respect to those claims there was either no evidence introduced at the show cause hearing to support the claims or the allegations did not state any violations because the facilities that PCS conducted business with were not listed on Exhibit "A".

SizeWise is entitled to relief, however, on its more general allegation of direct contempt by PCS. The Court finds that the Injunction prohibited the placement of bariatric products in prohibited hospitals regardless of whether the beds were placed for bariatric patients as that term is defined in the Injunction. Thus, Patient Care Systems, Inc. and Patient Care Systems of Oklahoma violated the Injunction by admittedly placing bariatric beds in prohibited facilities 14 times.

13

The Court, however, does not find Patient Care, Inc., Patient Care Systems (North Carolina), Inc., or Patient Care Systems of South Dakota to be in contempt because SizeWise introduced no evidence at the hearing to indicate that these PCS entities violated the terms of the Injunction.

The Court also does not find Superior to be in contempt. Superior placed a bed in a Sovereign Health facility in Clearwater, Florida. That facility was evidently purchased by a company that was not listed on Exhibit "A". Though Superior admittedly placed a bariatric bed in the Sovereign Health facility, SizeWise has not met its burden of establishing by clear and convincing evidence that this amounted to a violation of the Injunction. *Petroleos Mexicanos*, 826 F.2d at 401. At the time the bed was placed, Sovereign Health was not owned by any entity listed on Exhibit "A". While SizeWise could have demonstrated that Superior dealt with the same management and/or purchasing staff at the Sovereign Health facility that existed when it was owned by an Exhibit "A" entity, it produced no evidence at the hearing to support such a contention. Thus, Superior is not in contempt.

### 2. Liability of Barry Bearden

Barry Bearden is also subject to the Injunction. He is a named party because he is an agent of PCS pursuant the Injunction as well as an officer pursuant to Rule 65(d). He is also legally identified with all PCS entities because he owns them.

### 3. Liability of Safe-T Care

Safe-T Care was not a named party, and not legally identified with a named party. It is also not a successor corporation to PCS because Safe-T Care was not a new, previously nonexistent company formed to evade the Injunction. Nonetheless, Safe-T Care is subject to the Injunction because it aided and abetted Bearden. The Injunction enjoined PCS, its officers, agents, and anyone in active concert or participation with them. Bearden is an officer of PCS, and as mentioned above,

14

is therefore enjoined. Regardless of when Safe-T Care was formed, Bearden uses Safe-T Care to manufacture and market bariatric beds which the evidence shows have been placed in Exhibit "A" facilities in violation of the Injunction. Safe-T Care thus participated and acted in concert with an enjoined party. Moreover, Bearden, as the CEO of both PCS and Safe-T Care and the person in total control of the actions of those companies, had actual knowledge of the Injunction. That actual knowledge was imputed to Safe-T Care.

At the hearing Safe-T Care argued it did not do any business with customers on Exhibit "A", and that, given the nature of its consignment agreement with CST, it had no ability to direct Exhibit "A" customers to CST. Though, under the consignment agreement, Safe-T Care had no control over to whom CST rented, the rates, or the duration of any rental, it still aided and abetted Bearden in violating the Injunction. As Safe-T Care's CEO, Bearden had knowledge of the Injunction's terms. It could not profit by conveniently relying on CST's ignorance of the terms of the Injunction. Simply put, Safe-T Care, through Bearden, had a duty to inform CST of the terms of the Injunction. Because Safe-T Care failed to inform CST of the customers on Exhibit "A", Safe-T Care can be held responsible for any sales to Exhibit "A" customers. For the foregoing reasons, Safe-T Care can be held in contempt for aiding and abetting Bearden under Rule 65(d).

The Court finds it irrelevant that SizeWise failed to make Safe-T Care a party to the original litigation and Injunction, knew that Safe-T Care existed, and knew that Bearden owned it. The Court also finds it irrelevant that during the negotiations with respect to the Injunction, SizeWise failed in its attempt to include the term "Affiliates" as defined in the original PCS/SizeWise consignment agreement in a manner that would have included Safe-T Care within its ambit. The Court has determined that Safe-T Care has aided and abetted PCS and Bearden in violating the Injunction. Whether Safe-T Care and Bearden were named as an original party to the litigation or

15

named in the Injunction is therefore a moot issue.

### C. Allegations Against CareSource

CareSource was not a named party to the Injunction. CareSource is simply listed on Exhibit "A" as a customer with which PCS, Bearden, and Safe-T Care could not have engaged in business. Moreover, the listing of CareSource referred only to CSLLC. CST is also not a named party to the Injunction and, therefore, it could not be subject to contempt on that basis or the basis that it is identified with a named party. Nor is CST a successor corporation to an enjoined party. Therefore, CST can only be held liable if it aided and abetted a violation of the Injunction. The idea for CST surfaced before the Injunction was entered in March of 2003. Moreover, though its organizational documents were not completed until August 7, 2003, it has been doing business since late June or early July 2003. Though it is unclear whether CST began doing business prior to Bearden's telephone call to Pierce regarding the Ambassador 1200, SizeWise has not presented clear and convincing evidence that CST was established for the purpose of aiding and abetting violations of the Injunction.

Though the Injunction does not prohibit the manufacturing of bariatric equipment it does prohibit the leasing, renting or selling of bariatric equipment to entities listed on Exhibit "A". The Injunction also does not differentiate between end-user customers (e.g., hospitals and nursing homes) from wholesalers and distributors. The Injunction therefore would apply to bariatric business done with either wholesalers or distributors. The issue, however, is not whether CST did business with an enjoined party, because it is clearly not a party to the Injunction. Rather, the issue is whether CST knowingly and actively aided and abetted an enjoined party in violating the Court's order.

The Court finds that Pierce and CST did not have actual notice or actual knowledge of the

Injunction during the time period in which the alleged violations occurred. In order to find that CST had actual notice that it was precluded from distributing the Ambassador 1200 bed manufactured by Safe-T Care, SizeWise had the burden of establishing by clear and convincing evidence that Pierce or CareSource had actual notice that (1) Bearden was an agent or employee of PCS and was also bound by the Injunction; (2) CareSource had actual notice that, because Bearden was an agent of PCS, Safe-T Care was also bound by the terms of the Injunction; and (3) CST had actual notice that it could not distribute Ambassador 1200 beds to Exhibit "A" facilities because Safe-T Care was bound by the Injunction.

There is some conflicting testimony as to whether Pierce knew that Bearden was the president of PCS. However, this does not indicate that Pierce "knew everything there was to know about the Injunction." Moreover, even if Pierce knew that PCS and Bearden were enjoined, and even if he knew Bearden was president of Safe-T Care, that does not indicate that Pierce knew Safe-T Care was enjoined from doing bariatric business. Additionally, SizeWise's theories regarding inquiry notice are unconvincing. The law requires actual notice. Based on the evidence presented, especially the testimony of Pierce, which the Court finds to be credible, SizeWise has not provided the Court with clear and convincing evidence that Pierce and CareSource had actual notice or knowledge of the Injunction or with what entities the enjoined parties were prevented from doing bariatric business.

For the foregoing reasons, because CSLLC and CST reside outside the Court's territorial jurisdiction and because the Court finds that CSLLC and CST did not aid and abet any violations of the Injunction, the Court lacks jurisdiction over the claims against those non-parties. *See Waffenschmidt*, 763 F.2d at 714.

CareSource Retail is also not in violation of the Injunction. Though its name was mentioned

at the hearing, it was created after the entry of the Injunction, is not listed on Exhibit "A", and does not do any bariatric business. Thus any business conducted with CareSource Retail would not be a violation of the Injunction.

### III. Patient Care Systems' Motion for Contempt

SizeWise failed to give the notice required by the Injunction within ten days after July 10, 2004. SizeWise maintains that its failure to provide the July 10 letter should be excused by PCS' conduct in violating the Injunction. On August 27, 2004, it moved the Court to relieve it of its obligation to provide the July 10 letter.[3] That motion was denied. The Court finds SizeWise to be in contempt. The old axiom "two wrongs don't make a right" is particularly appropriate for application to this case.

### Conclusion

Based on the above findings and conclusions, the Court finds Patient Care Systems, Inc., Patient Care Systems of Oklahoma, Barry Bearden, Safe-T Care Manufacturing Co., and SizeWise Rentals, Inc. to be in violation of the Agreed Permanent Injunction. The Court, however, does not find Superior Medical Systems, Inc., Patient Care, Inc., Patient Care Systems (North Carolina), Inc., Patient Care Systems of South Dakota, CareSource, LLC, CareSource-Tulsa, LLC or CareSource Retail to be in violation of the Injunction. Accordingly, SizeWise's Show Cause Motion for Civil Contempt Against PCS and Non-Parties (Dkt. #94) is GRANTED in part and DENIED in part, and PCS' Motion for Show Cause Order for Civil Contempt (Dkt. #110) is GRANTED. SizeWise's Contingent Motion for Leave to Amend (*See* Dkt. #142) is DENIED as moot. Finally, the Court has addressed the issue of its jurisdiction over CareSource, LLC and CareSource-Tulsa, LLC.

---

[3] *See* SizeWise's Motion for Relief from and/or to Modify Injunction Restriction (Dkt. #112).

Accordingly CareSource's Motion to Quash/Dismiss Order to Appear and Show Cause (Dkt. #119) is DENIED as moot.

### Reserved Jurisdiction

The parties stipulated that the issue of damages and attorney fees should be reserved for a future evidentiary hearing following the Court's ruling on the cross-motions for contempt. Accordingly, a conference to determine a date for the hearing shall be held at 5:30 p.m. on October 19, 2005.

Signed this 30th day of September, 2005.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE